**IN THE UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA**

| | |
|---|---|
| **LEAH GEORGE,** | ) |
|       **Plaintiff** | ) |
| vs. | ) |
| **UNITED STATES OFFICE OF PERSONNEL MANAGEMENT,** | )  Case No. |
|       **Defendant** | ) |

**COMPLAINT–FEDERAL EMPLOYEES
HEALTH BENEFITS ACT**

Plaintiff Leah George, by and through her undersigned attorney, respectfully states the following:

**INTRODUCTION**

1. Plaintiff Leah George is a United States Foreign Service Officer, currently posted to Tijuana, Mexico.

2. More than ten years ago, while on a posting to Guadalajara, Mexico, Ms. George bravely adopted a malnourished infant, LG. Her husband died a few months before the adoption was final.

3. LG thrived in Ms. George's care, and initially met her developmental milestones.

4. But the effects of her early infancy, coupled with traumatic experiences growing up, caused LG to become hostile, threatening and violent.

5. Drugs were not helpful, and outpatient services insufficient. Finally, Ms. George found a residential treatment center that could help. She enrolled her daughter in Sandhill Child Development Center ("Sandhill"), which had a comprehensive plan to help LG develop to the point where she could live a healthy and successful life.

6. But Blue Cross Blue Shield ("BCBS") denied coverage. It asserted that residential mental health treatment for therapeutic purposes was not a covered benefit. Faced with exorbitant bills, Ms. George was forced to discharge LG from Sandhill against clinical advice.

7. The results were calamitous.

8. Over the next ten months, LG was hospitalized on three separate occasions.

9. After the third hospitalization, Ms. George determined to re-enroll LG at Sandhill. She would fight for the benefits she believed she was entitled to, but if she failed she would pay for the residential treatment by borrowing money from her pension plan.

10. BCBS allowed LG two weeks of coverage. It then determined that residential treatment no longer was medically necessary because her symptoms no longer were acute, even though residential treatment is appropriate for treatment of sub-acute illnesses such as that suffered by LG.

11. Ms. George appealed to the Office of Personnel Management ("OPM"), which affirmed the BCBS determination. The OPM Legal Administrative Specialist denied LG's need for more care not because the treatment was unnecessary or inappropriate but because LG did not clearly require hospitalization.

12. The entirely of the OPM analysis reads (bod-faced emphasis added):

*based on the clinical documentation and the plan definition of medical necessity, **continued inpatient care was not medically necessary** from 8/1/18-8/15/18. The patient did not have active suicidal ideation with plan, homicidal ideation with plan or command hallucinations. The patient was not physically aggressive, acutely manic or sexually inappropriate. The patient was not catatonic. The patient was medically stable. Therefore, we uphold the Plan's decision.*

13.     OPM's determination that LG was ineligible for residential mental health services because she did not need to be hospitalized ("inpatient care") was arbitrary and capricious, an abuse of discretion, and otherwise not in accordance with law.

14.     Plaintiff therefore requests that the Court direct OPM to direct BCBS to pay for LG's treatment.

## PARTIES

15.     Plaintiff Leah George is a resident of Tijuana, Mexico.

16.     Plaintiff is a participant in the Blue Cross and Blue Shield Service Benefit Plan (the "Plan"), a health benefits plan provided by Blue Cross Blue Shield to employees of the federal government under the Federal Health Benefits Act.

17.     LG is a minor dependent of Leah George and is a covered beneficiary under the Plan.

18.     Defendant Office of Personnel Management is an agency of the United States government.  OPM has contracted with BCBS to make the Plan available to federal employees.

## JURISDICTION AND VENUE

19.     Jurisdiction is proper in this Court pursuant to 5 U.S.C. § 8912, which provides that "the district courts of the United States have original jurisdiction, concurrent with the United States Court of Federal Claims, of a civil action or claim against the United States" founded on the FHBA.

20.     Venue is proper in this court pursuant to 28 U.S.C. § 1391.

## FACTUAL ALLEGATIONS

*Leah George is a Federal Employee and LG Is Entitled to*
*Coverage of Medically Necessary Services under the Plan*

21.   Plaintiff Leah George was born in Ithaca, New York, and grew up in Berkeley, California.  She graduated from Columbia University, and the NYU School of Social Work.

22.   After graduation, she served as a death-penalty case Mitigation Specialist for six years, working for the States of New York and California and in private practice.

23.   In May 2006, she took and passed the Foreign Service Exam, and became a consular officer in United States Embassies.  Her service includes tours of duty in Guadalajara, Mexico; Tel Aviv, Israel; Lilongwe, Malawi; and Suva, Fiji.

24.   As a federal employee, Leah George is authorized to participate in a health plan under the FHBA.  She participates in the Plan.

25.   The Plan provides for health benefits for federal employees and their covered beneficiaries.

26.   LG is a dependent of Leah George, and a covered beneficiary under the Plan.

27.   The Plan was in full force and effect at all relevant times during LG's course of treatment.

*Leah George Adopted LG,*
*Who Later Exhibited Threatening and Violent Behavior*

28.   LG was born in 2007 in Guatemala City.  She was placed in foster care after birth and suffered from malnutrition and neglect.  Leah George later learned that LG's biological mother was a victim of domestic violence and suffered depression during her pregnancy.  The biological mother almost lost her pregnancy with LG as a result of the domestic abuse she suffered at the time, and she then took medication that made her ill for the rest of her pregnancy in order to prevent a miscarriage.

4

29. In 2008, approximately eight months after LG's birth, Leah George adopted LG. Leah George's husband died while the adoption was in process.

30. In the summer of 2013, when LG was five, Leah George was posted to Africa. While in Africa, LG began exhibiting concerning behaviors. She began having tantrums about going to school, and the family went back to the United States after four months.  The family nanny died around that time.

31. After her nanny died, LG began threatening to kill the family, and was having "bursts of rage."  She would do things such as kick doors, and physically attack her mother, her older brother and infant sister.

32. The family moved to Fiji in 2014, and LG began displaying increasingly violent behavior. She began collecting weapons and would threaten her mother and older brother with knives. She continued to say that she wanted to kill the family.

33. While in Fiji, LG also stole expensive school supplies from her classmates and started having more difficulty with her peers. The family came back to the United States in September 2015.

34. LG was immediately hospitalized upon return to the United States for 40 days, then went directly into residential treatment for 6 months.

35. In April 2017 LG was again hospitalized, following an incident at a park where she was hitting and kicking her mother and threatening to hurt herself. The police were called, and LG asked one of them for their keys so that she could "stab her eyes out." That hospitalization lasted for 12 days.

*The Family Attempted to Treat LG in the Community,*
*But It Was Not Successful.*

36. Once discharged from the psychiatric hospital on April 21, 2017, LG continued to have violent and unpredictable behavior.

37. Leah George attempted to have LG treated in the community.

38. Beginning on May 15, 2017, LG received crisis intervention services provided by the State of Virginia's National Counseling Group.

39. The crisis intervention services took the form of a home-based intensive outpatient therapy.

40. But the intensive outpatient treatment was unsuccessful.

41. Despite crisis intervention counseling in the home five days per week between May 15, 2017 and June 7, 2017, LG continued to have aggressive and violent tantrums on a daily basis.

42. Leah George was 7 months pregnant at the time, but LG hit her and kicked her frequently, including in the pregnant belly on several occasions.

43. LG destroyed furniture and toys.

44. She kicked and hit and menaced her siblings as well, and they suffered emotionally from the ongoing threats and instability.

*LG Was Admitted for the First Time to Sandhill,*
*Which Created a Plan to Help Her Live a Health and Successful Life*

45. It was clear that LG could not be adequately and safely treated in the community. On June 9, 2017, LG was admitted to Sandhill for the first time.

46. She was admitted due to progressively concerning behavioral issues including unmanageable defiance and aggression. She had increasingly displayed aggressive behavior

towards any people who were present in the family home, especially toward Leah George. She also had become progressively more destructive of property, and increasingly aggressive and menacing.

47. Leah George selected Sandhill carefully based on its excellent reputation for treating adopted children with a history of trauma resulting in attachment and mood disorders.

48. Upon admission, she was diagnosed with Disruptive Mood Dysregulation Disorder (DSM5 Code F34.81) and Adjustment Disorder, with Mixed Disturbance of Emotion and Conduct (DSM5 F43.25).

49. As her treatment plan explained:

> According to the initial brain metric, [LG's] cortical modulation ratio (CMR) is 17.18% of age typical. According to the Child Trauma Academy, cortical modulation "refers to the capacity of important cortical networks to regulate and modulate the activity and reactivity of some of the lower neural systems.... The CMR "reflects both 'strength' and over-reactivity in lower regions involved in the stress response." This score indicates that [LG] has "minimal capacity to self-regulate". Interventions are Essential in the Self-Regulation, Relational, Somatosensory and Cognitive Domains.

50. LG's mental health deficits, combined with her fear of abandonment, made her unable to control her emotions. LG often was able to control herself with strangers who did not present a threat of abandonment but was especially cruel and angry towards the people closest to her.

51. Accordingly, Sandhill developed an intensive plan for teaching LG how to deal with her emotions. As the plan explained, the therapy program at of Sandhill "emphasizes a clinical approach that is neurodevelopmentally informed. It is grounded in the Neurosequential Model of Therapeutics (NMT) developed by Bruce Perry and the Child Trauma Academy. At the heart of this philosophy is helping children and

7

adolescents regulate fear-terror states. According to Perry, there are four ways to regulate the brain: (1) Relational Regulation; (2) Somatosensory Regulation; (3) Self-Regulation; (4) Pharmacological Regulation. Relational Regulation is the primary way, because it works at all levels of the brain. The brain is fundamentally a social organism and it works best when one feels safe. So, this is a major focus of our work and it lays the foundation for every intervention at Sandhill."

52. LG's psychiatrist recommended a 12 to 18 months treatment plan at Sandhill. As a medical note (emphasis added) reflected at the time:

> Because of [LG]'s early life experiences, she struggles with regulating her affect and arousal on a day to day basis. She also struggles to build healthy attachments with her caregivers. This has lead to a distrust of adult care, and to a need for control. Again, due to traumatic early life experiences, [LG]'s brain did not develop in a neurotypical way. Because of this, she struggles with being able to regulate her emotions, which often results in emotional outbursts or tantrums, and at times aggression. . . . . . *If [LG] receives treatment that focuses on helping her build healthy, trusting relationships with her caregivers as well as helping her learn to regulate her emotions, she has the potential to lead a healthy and successful life. It is however still apparent that [LG] requires a highly structured and predictable environment with significant adult support to help her manage her emotions in a safe manner. Absent of this, her ability to regulate her affect and mood in the context of her home setting with her family is of great concern.*

53. LG received intensive residential treatment at Sandhill for just over two months.

54. But then BCBS denied further coverage for the treatment.

55. Leah George paid out-of-pocket, but eventually could not afford the residential treatment. She was forced to withdraw LG from treatment against medical advice, effective August 15, 2017.

56. At discharge, LG's clinician observed that "[i]t is our clinical opinion that in order to grow and make meaningful change, LG will require a residential treatment program that will

address these issues, and that will provide her with a sensory diet of neuroregulatory interventions to help her brain to develop."

57. BCBS later acknowledged its error. By letter dated October 27, 2017, more than two months after LG had been discharged, BCBS sent Leah George a letter conceding that the admission had been medically appropriate.

58. But by then it was too late. LG had been discharged, and was in a different program.

59. After LG's discharge, Leah George enrolled LG in an outpatient therapy program in San Diego.

60. But as the Sandhill clinicians had predicted, the result was calamitous. Over the next ten months, LG was hospitalized three times, and also was admitted to a residential treatment center for stabilization, due to her explosive episodes and unsafe behavior.

61. Her admissions referenced the "5150" statute, (California's Welfare and Institutions Code) which proscribes an involuntary detainment locked in a psychiatric facility for individuals experiencing a mental health crisis for further assessment when presenting a danger to themselves, a danger to others, or "gravely disabled."

62. After the first two hospitalizations in November 2017 and February 2018, LG enrolled at a residential treatment center in April 2018, which BCBS authorized for a one-month period of "stabilization." Clinical staff at Oak Grove recommended a longer placement, but were unable to gain traction from BCBS. After LG was released from Oak Grove, LG was hospitalized a third time in July 2018.

63. Finally, Leah George determined to get LG the mental health treatment she needed, no matter what the barriers. She enrolled LG again at Sandhill.

| Timeline ||||
|---|---|---|---|
| **Date** | **Event** |||
| April 2017 | Park incident. LG hospitalized for 12 days after threatening police in park. |||
| June 2017 | LG Admitted to Sandhill. |||
| August 2017 | BCBS denies coverage. LG discharged from Sandhill against Clinical advice. |||
| *September 2017 to April 2018.* | *Outpatient therapy in San Diego.* |||
| | November 2017 | LG hospitalized at Rady Children Hospital ||
| | February 2018 | LG hospitalized at Rady Children Hospital ||
| April 2018 to May 2018 | Short Term Residential Treatment at Oak Grove following hospitalization. |||
| May 2018 to July 2018 | Therapist in Tijuana |||
| | July 2018 | LG hospitalized at Rady Children's Hospital ||
| July 16, 2018 | Second Admission to Sandhill. |||

64.     Upon her second admission to Sandhill, LG was diagnosed with Disruptive Mood Dysregulation Disorder as well as of Reactive Attachment Disorder.

65.     Sandhill clinicians again recommended a 12-18 months course of treatment.

66.     BCBS initially denied preauthorization for residential treatment at Sandhill Center because it maintained that residential treatment must provide 24-hour nursing care to be approved by BCBS.

67.     Leah George appealed this determination directly to the preauthorization department of BCBS by showing them that the BCBS Member Service Benefit Plan does not require 24-hour nursing care for residential treatment. BCBS relented and preauthorized LG's

stay at Sandhill. BCBS approved payment for two weeks of treatment. Then, it denied further coverage effective July 31, 2018.

68. Leah George was determined to continue providing LG the treatment she needed in order to lead a healthy and productive life. She committed to paying for LG's treatment out-of-pocket.

69. To finance the treatment, she borrowed the necessary funds from her pension plan.

*BCBS Improperly Applied a Clinical Standard to Deny Treatment*

70. As a Plan beneficiary, LGs benefits are subject to the Plan's medical necessity requirement.

71. The Plan defines Medical Necessity, on page 150 of the 2018 Service Benefit Plan, as follows:

> Medical necessity shall mean healthcare services that a physician, hospital, or other covered professional or facility provider, exercising prudent clinical judgement, would provide to a patient for the purpose of preventing, evaluating, diagnosing, or treating an illness, injury, disease, or its symptoms. Additionally, "generally accepted standards of medical practice" means standards that are based on credible scientific evidence published in peer-reviewed medical literature generally recognized by the relevant medical community and physician specialty society recommendations.

72. The BCBS review was conducted by Timothy Stock, who purportedly applied the Residential Acute Behavioral Health Level of Care, Child or Adolescent, MCG Health, Behavioral Health Care, 21st Edition.

73. Dr. Stock's opinion on behalf of BCBS in another case was held to be arbitrary and capricious because he unreasonably ignored the weight of the medical evidence showing that a patient continued to require residential treatment. *Dominic W. on behalf of Sofia W. v. N. Tr. Co. Employee Welfare Benefit Plan*, 392 F. Supp. 3d 907, 919 (N.D. Ill. 2019).

11

74. As its name betrays, the MCG Health Guidelines for Residential Acute Behavioral Health Level of Care, Child or Adolescent are targeted towards "acute" care. But residential care may be appropriate for acute or sub-acute conditions. The MCG Guidelines are being challenged *inter alia* on this basis in a class action lawsuit in *Smith v. Health Care Services Corp.*, No. 19-cv-762 (N.D. Ill., October 13, 2019).

75. In any event, BCBS' purported application of the Guidelines ignored entirely the standard that applies to medical treatment.

76. The MCG Guidelines has distinct requirements for discharge. For example, it requires that "Treatment goals for level of care met."

77. Dr. Stock purportedly applied the MCG Guidelines and determined that coverage was to terminate. But rather than focus on LG's mental health treatment, he applied an acute care standard to determine whether she was a threat to herself or others, or needed round-the-clock treatment. He also failed to address the Guidelines, or to evaluate whether the standards set out in the Guidelines had been met.

78. The entirety of his analysis and conclusion was that:

> "On the dates in question, [patient] was not a danger to herself. P[atient]t was not a danger to others. P[atien]t was not aggressive. P[atient]t was not violent. P[atien]t no longer required 24hr nursing, psychiatric, or behavioral care. As such, the prior determinations are upheld. The lcd remains 7/31/18. The Last Covered Day is 7/31/18. The recommended alternative LOC is PHP."

79. Dr. Stock's analysis did not reflect any knowledge of LG's history of treatment, or current clinical recommendations.

80. Instead, Dr. Stock simply looked to the patient to determine whether she had one of a few indicators of severe acute illness. Since she did not, he determined that a discharge was appropriate.

81. BCBS ignored its own standards when it determined that LG should be discharged against clinical advice.

*OPM Applied an Inpatient Standard.*

82. On March 4, 2019, Leah George submitted her appeal to OPM.

83. Her appeal included a 15-page analysis demonstrating, in highly specific fashion, how LG met the standards described in the MCG Mental Health Guidelines.

84. On May 30, 2019, a Legal Administrative Specialist issued a decision denying the appeal on behalf of OPM. The Legal Administrative Specialist openly acknowledged that she was applying an inpatient standard, rather than a residential standard:

> *based on the clinical documentation and the plan definition of medical necessity,* ***continued inpatient care was not medically necessary*** *from 8/1/18-8/15/18. The patient did not have active suicidal ideation with plan, homicidal ideation with plan or command hallucinations. The patient was not physically aggressive, acutely manic or sexually inappropriate. The patient was not catatonic. The patient was medically stable.* Therefore, we uphold the Plan's decision.

85. Had Leah George been requesting coverage for a hospitalization, the OPM analysis might have been correct. But LG was seeking approval of residential care that LG needed in order to overcome her early life deficits and later trauma, and to live a healthy and successful life.

86. The application of inpatient hospitalization standards to deny a request for residential treatment was arbitrary and capricious, an abuse of discretion and not in accordance with law.

*Subsequent History*

87. LG's need for continuing care at Sandhill was confirmed by subsequent events there.

88. On September 8, 2018, just five weeks after BCBS denied further treatment, LG began yelling and cursing, and then started hitting and kicking staff. Due to the immediate danger of the situation, LG was put in a TCI approved Personal Restraint.

89. She was forcibly restrained again in November and December 2018, and once each in April, May and June of 2019.

90. These incidents reflected only the most violent and threatening incidents that occurred during this time period.

91. The incidents occurred despite the strong supports and treatment LG was receiving at Sandhill.

92. Had LG been living in the community, it seems likely that similar incidents would have required repeated hospitalization.

93. LG has not been restrained since June. Sandhill is planning to discharge her in January 2020.

*Damages*

94. As a result of the OPM denial, plaintiff has been forced to pay for the cost of LG's residential care out of pocket. The costs to-date exceed $100,000.

**As and For a First Cause of Action
Breach of Contract**

95. Plaintiff repeats and realleges the previous allegations of the Complaint as if fully set forth herein.

96. BCBS, as agent for OPM, breached its contract with plaintiff by denying medically necessary treatment for LG.

## As and For a Second Cause of Action
## Violation of the Administrative Procedure Act
## (5 U.S.C. § 702)

97. Plaintiff repeats and realleges the previous allegations of the Complaint as if fully set forth herein.

98. OPM's decision denying medically necessary treatment for LG is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

1. Issue an order directing OPM to require the carrier to pay the amount of benefits in dispute;

2. Order OPM to pay attorneys' fees, expenses, fees and costs;

3. Provide such other relief as is fair and just.

Dated: January 13, 2020

Respectfully submitted,

*Martin Bienstock*

**BIENSTOCK PLLC**
Martin Bienstock
1629 K. St. NW, No. 300
Washington, D.C. 20902
(Tel) 202-908-6601

MBienstock@BienstockPLLC.com

*Counsel for Plaintiff*